2021 IL App (1st) 200534-U

SIXTH DIVISION
March 31, 2021

No. 1-20-0534

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* N.K., G.J., M.K., Minors, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Minors-Respondents-Appellants | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 19 JA 531 |
| | ) | 19 JA 532 |
| VANEATHEA J., | ) | 19 JA 532 |
| | ) | |
| Mother-Respondent-Appellee, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHADEE K., | ) | Honorable Patrick T. Murphy, |
| | ) | Judge Presiding. |
| Father-Respondent-Appellee.) | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Trial court's order that dismissed the petitions for adjudication of wardship and concluded that the State did not prove anticipatory neglect of the minors by the preponderance of the evidence was not against the manifest weight of the evidence; affirmed.

¶ 2    The Office of the Public Guardian (Public Guardian), on behalf of respondents G.J., M.K., and N.K., the minors' court-appointed guardian *ad litem,* appeals an order of the circuit court that dismissed the State's petitions for adjudication of wardship and concluded that it could not find anticipatory neglect by a preponderance of the evidence. The Public Guardian contends that the court's finding that the three minors were not neglected or abused was against the manifest weight of the evidence. The Public Guardian asserts, *inter alia*, that the parents, respondents-appellees, Vaneatha J. and Shadee K., did not overcome the *prima facie* case of neglect of the three children that was created by the severe neglect of their younger sibling, Cheri, who died six weeks after she returned home to their care. The State did not join the Public Guardian as an appellant, but agrees with the Public Guardian and argues that the circuit court's dismissal of the petitions for adjudication of wardship of the minors was contrary to the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On May 23, 2019, the State filed petitions for adjudication of wardship for the three children, G.J., M.K., N.K., that all alleged that the minors were neglected based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused based on a substantial risk of physical injury to the minors by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function (705 ILCS 405/2-3(2)(ii) (West 2018)). The petitions alleged the same facts, which included, *inter alia*, that the minors' younger sibling, Cheri, who was born on August 21, 2017, was previously found to have been neglected and that, after Cheri returned to her parents' care on March 27, 2019, she unexpectedly died on May 9, 2019. During the course of the proceedings in the trial court, the

mother was represented by the Office of the Cook County Public Defender and the father was represented by a court-appointed attorney.

¶ 5        Before we address the proceedings with respect to the petitions at issue here, we will include a summary of the proceedings related to petitions filed in 2018 based on the neglect of Cheri for background purposes only.

¶ 6                                                  2018 Proceedings

¶ 7        In April 2018, the State filed petitions for adjudication of wardship for the respondents' four minor children, G.J., M.K., N.K., and their younger sibling, Cheri, based on Cheri's failure to thrive and nutritional neglect.[1] The petitions alleged the minors were neglected based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused based on a substantial risk of physical injury to such minor other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment or any bodily function (705 ILCS 405/2-3(2)(ii) (West 2018)). The petitions alleged, *inter alia*, as follows. On March 28, 2018, the minors' sibling (Cheri) was hospitalized due to concerns with her lack of weight gain since birth, the parents delayed seeking medical treatment for her, and she had not seen a physician since September 2017. Cheri was diagnosed with severe failure to thrive and malnutrition due to nutritional neglect.

¶ 8        At the temporary custody hearing in early April 2018, the State told the court that Cheri had not received medical care since September 2017 and that when she was brought to the hospital seven months after she was born, she weighed approximately the same amount that she had weighed at birth. At that time, Cheri's older siblings, G.J., M.K., and N.K., were, respectively,

---

[1] The report of proceedings relating to the 2018 petitions is contained in the record. However, the common law record with exhibits relating to these petitions are not included as a separate common law record. The 2018 petitions are included in People's Exhibit Number 8, which is a disk containing records from the Hephzibah Children's Association.

ages seven, three, and two. The Public Guardian told the court that the minors were at risk because the parents did not follow up with Cheri's care or medical needs. The court entered a finding of temporary custody without prejudice and continued the hearing.

¶ 9       At the next temporary custody hearing in April 2018, the parties informed the court that they had agreed to an order of temporary custody as to Cheri, but did not agree on the placement of G.J., M.K., and N.K. A child protection investigator from the Illinois Department of Children and Family Services (DCFS) testified that in April 2018, she did not observe any marks or bruises on G.J., M.K., or N.K. She testified that the minors were examined by physicians and "appeared to be well" and did not have any special needs. Following the hearing, the court ordered G.J., M.K., and N.K. to return home under an order of protection.

¶ 10      At the next status hearing in July 2018, James Bracey, an employee of DCFS, testified as follows. He had monitored the minors since they returned home, the home was safe and appropriate, there were no signs of abuse or neglect, and there had been no unusual incidents since the children returned home. The mother was meeting their needs and they appeared happy. The children had a "[l]oving, caring relationship" with the father and they would "run to him every time they see him." The mother and father started an intensive outpatient program in April 2018 and had attended the weekly sessions. He did not currently have any concerns about their sobriety. Bracey had not seen Cheri because she was still in an assessment process with her physician and was having constant seizures.

¶ 11      The adjudication hearing was held on August 29, 2018. Loretta Bayless, a DCFS case worker, testified as follows. On March 28, 2018, Cheri, who was nine months old, was referred to DCFS for "failure to thrive." On that same day, she spoke with the mother at the hospital, who told her that Cheri was last seen by a physician about one month after she was born and that she

had not taken her to another visit since that time because there was "something going on with her insurance." Donna Morrison, a DCFS investigator, testified that in March 2018, the mother and father completed drug drops and the mother tested positive for marijuana and the father tested positive for cocaine. Morrison testified that the parent's home was neat, clean, safe, and appropriate. She testified that there was plenty of food available and the minors appeared to be healthy.

¶ 12    Following the hearing, the court dismissed the petitions for adjudication of wardship for G.J., M.K., and N.K. In its oral ruling, the court stated that it did not "hear a scintilla of evidence that the children were neglected in any way, shape or form" and that the evidence showed that "we have a very sick child and a mother who perhaps through unsophistication didn't provide for that child in a way a more sophisticated parent would have." The court also stated that it heard "there was cocaine use and marijuana use," it "heard nothing about it other than the fact they used it," and it did not hear "a scintilla of evidence that it was in any way, shape or form impacting negatively on their kids." With respect to Cheri, the court found she was neglected due to lack of necessary care, noting that she did not receive the proper medical care. Neither the State nor the Public Guardian appealed the court's order dismissing the petitions as to G.J., M.K., and N.K.

¶ 13    The dispositional hearing for Cheri took place on January 29, 2019. Anastasia Zacour, a case worker from Hephzibah Children's Association, who had been with the family since August 2018, testified as follows. The medical staff concluded that Cheri had Dandy Walker syndrome, which caused seizures and required her to have an emergency seizure kit and daily medication. In November 2018, the mother tested positive for methamphetamine. Both the mother and father had missed other drug tests, which Hephzibah recommended completing each month. With respect to G.J., M.K., and N.K., they were healthy, happy, and were being well cared for. The court entered

and continued the dispositional hearing and stated that it wanted the parents to get any training they needed in their home for Cheri within 14 days, after which it wanted unsupervised visits with Cheri in the home.

¶ 14    At the next dispositional hearing on March 25, 2019, Zacour testified as follows. With Cheri's diagnosis of the Dandy Walker disease, Cheri would likely be unable to see, walk, or talk. The mother had attended and participated in Cheri's visits with her medical team, Cheri had unsupervised visits, and the mother was doing well managing Cheri's needs. Neither parent had complied with Zacour's request to complete random urine drops. During Zacour's visits, she did not see any evidence of drug use or paraphernalia or that the parents were under the influence of any drugs or alcohol. In order for Zacour's agency to recommend return home for Cheri, the agency wanted the mother and father to complete drug drops. The agency recommended Cheri be made a ward of the court and placed with DCFS guardianship.

¶ 15    Following the hearing, the court found both mother and father fit, willing, and able and ordered Cheri to return home under an order of protection requiring the parents to complete a negative drug drop. In doing so, the court stated:

> "I wish the parents would do the drops. On the other hand there are a lot of wealthy people in the suburbs I suspect are using drugs and parenting children.*** The child was injured in foster care, never injured in the parents' home. Parents clearly love the kid. The mom is going—it's difficult for her to go to all of these doctor[s'] appointments on the far west side. She lives in Englewood. She's done everything we've asked of her and she couldn't do therapy, because even though we said we were going to provide it, we didn't."

The court also stated that before it would close the case, the parents had to complete a drug drop. Cheri was returned home to her parents' care on March 27, 2019.

¶ 16                          2019 Petition and Proceedings

¶ 17       On May 21, 2019, the minors, G.J., M.K., and N.K., were taken into protective custody. On May 23, 2019, the State filed motions for temporary custody for them, asserting that there was an immediate and urgent need to take the children into custody under section 2-10 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-10) (West 2018)). On May 23, 2019, the State also filed the petitions for adjudication of wardship at issue for the three minors. The State alleged that the minors were neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and because there was a substantial risk of physical injury to the minors by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function (705 ILCS 405/2-3(2)(ii) (West 2018)).

¶ 18       In the motions and petitions, the State alleged as follows. The parents had three minor children (G.J., M.K., and N.K.) and one other minor child (Cheri) in their care who had previously been in DCFS custody after the court had entered a finding of neglect. Cheri returned to the parents' care on March 27, 2019. An in-home early intervention specialist ceased services due to the father's aggressive behaviors and, as of April 24, 2019, she had lost weight while in the parents' care. Medical personnel diagnosed the minor with failure to thrive and medical neglect and stated that the parents missed a medical appointment after she returned to their care. On May 9, 2019, she was unresponsive and pronounced dead. Before she died, she had been sleeping on the couch and the medical personnel stated that the death was unexpected despite her special needs. According to the medical examiner's office, the cause and manner of her death was pending. The parents had refused random urine drops for several months before her death. The State requested that the parents' three older children, G.J., M.K., and N.K., be adjudged wards of the court.

¶ 19                          Temporary Custody Hearing

¶ 20      The temporary custody hearing was held on March 28, 2019. The court asked the State if there was "any evidence that [the minors] were neglected or abused?" and the State responded, "Directly, no. And we're thankful for that." The court also asked the Public Guardian if there was any evidence that the children were abused or neglected, and the Public Guardian responded, "I don't know of any evidence of any overt things of abuse, physical abuse, them not being fed, that nature," and "I do believe that there is evidence of neglect, not, again, in the sense of them not being fed, but I believe the environment in which they were living is an unsafe environment."

¶ 21      Dr. Jill Glick, the medical director of the Child Advocacy and Protection Service Team at the University of Chicago, testified as an expert and witness. On April 24, 2019, at a follow-up visit at the University of Chicago, Cheri had lost three pounds since her last appointment. Glick was concerned about Cheri's weight loss and told her social worker to call Loyola University Chicago Medical Center (Loyola) to make sure Cheri showed up for her neurology appointment at Loyola that was scheduled for May 1, 2019. Glick later learned that Cheri missed that appointment. It was Glick's opinion that Cheri's death was unexpected.

¶ 22      Zacour, from Hephzibah Children's Association, testified that she had visited the parents' home every week since August 2018 and further stated as follows. She believed it was in the minors' best interests to remain in the home with the parents. She never had any concerns about the safety of G.J., M.K., and N.K. or that they were being mistreated, neglected, or not getting enough food. They appeared to be the correct weight for their ages and were not suffering from malnutrition. There had never been a hotline call made about them. She believed the parents could care for the minors safely and provide for their needs.

¶ 23      Zacour further testified that throughout the course of the case, the mother satisfactorily completed parenting classes and drug treatment. Zacour observed the mother participate in Cheri's

medical appointments and she was engaged, gave meaningful feedback, and asked questions. Zacour did not have any concerns about the mother's ability to parent her children. In November 2018, the mother tested positive for marijuana and methamphetamine. The mother and father had not complied with her requests for random urine screens. Asked by the court what she thought about the parents not complying with the drug drops, she responded that there could be many reasons, such as the time it would take to get there. She never saw marijuana in the home, smelled it, or saw any physical symptoms in the mother that led her to believe that she had been using it. She never observed the father "under the influence." She made several therapy referrals for the mother and father, but the referrals were not accepted at any agencies, as there were no service providers available in the location where the family lived. The father was never aggressive with Zacour and never threatened her.

¶ 24      Zacour also testified that on April 25, 2019, she spoke with the mother about Cheri's Early Intervention therapy. Zacour testified that, according to the mother, a therapist had come the previous day and was not going to return "because the therapist felt that dad was aggressive." Zacour spoke with the Early Intervention coordinator, who did not give Zacour a description of what happened, but told Zacour the therapist would not be returning to the home "because of what she perceived as aggression."

¶ 25      Zacour testified that before Cheri came home in March 2019, there had been a change to Cheri's feeding recommendations. An Early Intervention feeding specialist went to Cheri's foster home on March 24, 2019, and discontinued Pediasure, which was what Cheri had been eating daily. The court asked Zacour: "Was there any—there was some testimony here that at Loyola they said the child—should not get Pediasure or ** cows' milk. Did you know that or did the mother know that?" She responded, "You know, I had never received that information. I had

only received the information of the three times a day Pediasure that was prescribed, I want to say, like, in January maybe." Zacour testified that the Early Intervention team prescribed the Pediasure. The court asked Zacour about the previous testimony regarding Cheri's feeding plan and stated as follows: "But Dr. Glick testified that her review of the Loyola records was that the child should not be receiving cows' milk or Pediasure. *** And she was concerned when she found out the kid was getting cows' milk. And now I'm told a different team came back after Loyola and prescribed Pediasure. Is that what I'm hearing?" Mother's counsel responded, "Yes, judge."

¶ 26    Pamela Gibson, a DCFS child protection investigator, testified that on May 21, 2019, she created a Child Endangerment Risk Assessment Protocol (CERAP) for the three children and concluded the home was unsafe based on medical neglect of Cheri. Dedra Owens, an investigator for DCFS, testified that she investigated the mother and children at the parents' home on May 8, 2019. She recommended that temporary custody be given to the guardian of DCFS based on the fact the parents did not comply with services that were offered and the completed services had not been effective. Owens testified that she did not see any signs of abuse or neglect with respect to G.J., M.K., or N.K. on the day Cheri died.

¶ 27    After the State, the Public Guardian, and the mother rested, the court told the parties that it wanted to hear from one of the parents about how they found Cheri when she died. Thereafter, the court examined the father, who testified as follows. The morning before Cheri died, he had come home from work at 4 a.m., and Cheri and M.K. were sleeping on the couch in the family room, with M.K. at the head of the couch. G.J. and N.K. were also sleeping on a couch. He testified that "[s]he (indicating) was upstairs asleep."[2] He testified that he tickled Cheri's stomach and "she reacted," which "was fine with me." He then went upstairs. Around 7:30 that morning,

_____

[2] The transcript does not identify who the father was referring to when he "indicated."

"[s]he (indicating) had got up to get Gio ready for school," after which all three children came running into the room with Cheri, who had "gel snot or something like that, snot that hardened up in her nose." He tried to do CPR and "told her (indicating) to calm down." He "gave her the baby and she did CPR, the correct way." Cheri did not respond to the CPR.

¶ 28    Following the testimony, the State and the Public Guardian requested the court take temporary custody of G.J., M.K., and N.K. based on findings of probable cause and an urgent and immediate necessity to remove them. Asked by the court what was "the urgent and immediate necessity?", the Public Guardian responded, "I believe the testimony that you heard absolutely was that there were no overt signs of abuse regarding any of the three children, there was no neglect, such as malnutrition, things of that nature," but "I believe the testimony you've heard was that DCP representatives as well as Dr. Glick were concerned about neglect in the environment for these three children."

¶ 29    During the Public Guardian's closing argument, the court asked the Public Guardian about Cheri's feeding plan:

> "[W]hat about the fact *** that the kid lost weight and she was concerned that the mother was feeding the kid cows' milk and Pediasure when Loyola said don't do it. And yet the testimony was that, in fact, the Early Intervention team went out and told her to do it."

The court also stated, "So they contradicted Loyola, and the mother apparently followed their advice, which was wrong." The Public Guardian responded: "What you heard was both what you heard about the underlying case, *** which is that when Cheri entered DCFS care, she was effectively at her birth weight several months into her life when she had been in her parents' care

and custody. Upon her return to parents care and custody, she lost roughly three pounds in roughly five weeks." The court responded that the Public Guardian did not answer its question.

¶ 30    Following argument, the court found probable cause by the "bare minimum, because the parents haven't taken the drug drops." The court did not find that there was an urgent and immediate necessity to remove the minors from the home. In doing so, the court stated that it found Glick, Zacour, and the father "very credible" witnesses. The court stated that there was no evidence that the three minors "were ever harmed in any way, shape, or form" and that, according to Zacour, the minors were in good care and condition. It also stated that Cheri should not have been sleeping on the couch with a four year old and, given her condition, should have been in a bassinet. With respect to Cheri's feeding plan, the court stated: "But again—the milk issue, Loyola—according to [Glick], says no milk, no Pediasure. Then we hear from Zacoura [*sic*] that other doctor said milk and Pediasure. That could have contributed to the weight loss."

¶ 31    The court entered a written order ordering the children to return home to the parents under an order of protection pursuant to section 2-25 of the Act (705 ILCS 405/2-25 (West 2018)). The court ordered the parents to provide samples for random drug screens upon DCFS's requests and to refrain from using or possessing illegal substances. The court ordered the parents to take a drug test no later than June 7, 2019.

¶ 32                    Motions Following Temporary Custody Hearing

¶ 33    On June 18, 2019, the Public Guardian filed an emergency motion to vacate the order of protection and requested that the court find that the mother and father violated the order of protection that allowed the children to stay in the parents' home. It asserted that the father refused to participate in a June 6, 2019, urine screen and the mother's urine tested positive for marijuana. The Public Guardian stated that, "[w]hile [the mother's] positive test result is concerning, the basis

for this motion and the request that this Court immediately remove all three children from the home is based almost exclusively on [the father's] ongoing refusal to cooperate with both the family's assigned caseworker and this Court." On June 19, 2019, the court entered a written order that ordered the father to submit an immediate urine drop.

¶ 34    On October 23, 2019, the Public Guardian filed a motion to vacate the order of protection, asserting that although the father had a negative urine drop in late June 2019, he refused to complete drops in July 2019 and September 2019. Meanwhile, the mother completed the drops in these months and tested positive for marijuana. It asserted that the father's ongoing refusal to complete the requested urine drops in July 2019 and September 2019 violated the order of protection.

¶ 35                          Adjudication Hearing

¶ 36    The adjudication hearing was held on October 29, 2019. The Public Guardian informed the court that it had a pending motion that requested the court to vacate the order of protection based on the father's refusal to participate in the drug drops. The court responded that the case "came in because of a very sick child" and that it would not vacate the order that sent the children home "unless there was an allegation that the children were somehow suffering or being neglected." It told the parties that "[t]he fact that the father *** didn't do drops absent an allegation that the kids were suffering because of that wouldn't be enough in this particular case" and if the case "came in because the kids were neglected because of the father's drug habit that'd be something else." The court continued its ruling on the motion. The court also ordered the child protection case for Cheri abated because she was deceased.

¶ 37                    People's Exhibit Numbers 1, 2, and 3

¶ 38    Before the testimony started, the court entered into evidence the State's exhibit numbers 1, 2, and 3. People's exhibit number 1 consisted of the certification and delegation of authority document that accompanied the University of Chicago Comer Children's Hospital (Comer) Records for Cheri (1a) and a disk containing the certified full and complete medical records for Cheri from Comer (1b and 1c).

¶ 39    The State's exhibit number 1c showed that Cheri, who was born on August 21, 2017, was admitted to the University of Chicago Medical Center on March 28, 2018, and discharged on April 6, 2018. The record shows that the initial consult section was completed by Dr. Veena Ramaiah on March 29, 2018, and stated as follows. Cheri presented with severe failure to thrive and severe chronic protein calorie malnutrition. A pediatrician saw Cheri when she was three weeks old. Cheri missed subsequent follow-up appointments until she sought care on March 28, 2018. The mother reported that she intended to take Cheri to appointments at various times, but was limited by lack of insurance and challenges with transportation. The mother's aunt was a retired pediatrician and regularly saw Cheri and did not have concerns regarding Cheri's development until about one month prior to presentation. The mother had six other children, three of whom the mother reported were healthy and three whom were evaluated in the emergency room and deemed healthy. This "would suggest that mom had adequate knowledge of an experience with normal child development," but that, with Cheri, "there were failure to thrive indicators that were likely not appreciated and [the] severity of current presentation was not recognized." The mother's three other children who lived with her were evaluated in the emergency department and appeared healthy and normal, with two of them being above the 97th percentile and the other above the 50th percentile in weight.

¶ 40    Cheri's medical record from Comer also shows that Dr. Ramaiah authored a follow-up consult note on April 6, 2018, which stated as follows. Cheri had "multiple abnormalities of the cerebral hemispheres and cerebellum" and an MRI of the brain showed significant and complex congenital brain malformation. Cheri had "abnormalities found on MRI that could have been identified much sooner had the parents gotten medical care" and the "severity of her developmental delay would have been identified by medical providers if they had been involved in her care." Cheri thrived in the hospital "[i]n spite of these abnormalities found and even without a final diagnosis" and her "growth has been significant on regular calories formula." The medical providers were "confused by the caretakers' lack of insight into the severity of the child's condition" and the "past failure by history is very concerning for future risk to the child if the child remains with this family." The mother reported marijuana use at home and stated that she did not smoke around the children, but smoked in the garage with Cheri's father.

¶ 41    The State's exhibit number 1c also contained Dr. Glick's outpatient notes completed for Cheri on May 2, 2019, which stated as follows. Cheri was hospitalized at Loyola on March 25, 2019, for seizures and was discharged on March 29, 2019, at which time she was told to return to the clinic in two weeks. Cheri came to Comer on April 24, 2019, for a well child examination and had severely dropped in weight, as she had lost 3 pounds in 25 days. The mother reported that she fed Cheri 3 meals per day, plus 2 snacks, and 24 ounces of whole milk, which was more than her previous foster parents had reported and "yet she was thriving in foster care." The mother was told to return in two weeks for a weight check with an interval appointment at Loyola's neurology clinic on May 1, where they could also check Cheri's weight. Cheri did not show up for her appointment on May 1. According to a placement worker for Hephzibah, Cheri's parents refused drug drops and a therapist from Early Intervention did not want to return to the home due to the

father's aggressive behaviors. Cheri's "weight loss in such a short time, coupled with her parent's refusal to cooperate with requested tasks, along with her dad's behavior creating an environment where providers are uncomfortable treating her constitutes medical neglect." Glick made a report to DCFS for failure to thrive. Glick's progress notes showed that on March 29, 2019, Cheri weighed 19 pounds, 10.6 ounces, and that on April 24, 2019, she weighed 16 pounds, 15.6 ounces.

¶ 42    The State's exhibit number 2 was the certified death certificate for Cheri, which stated that the manner of death "could not be determined" and it was "unknown if the sleep environment or other external factors caused or contributed to death." The State's exhibit number 3 was a certified copy of the Cook County Medical Examiner's report, which stated as follows. Cheri weighed 18 pounds, 6 ounces, which was 1 pound and 7 ounces more than she weighed at her last measurement on April 24, 2019. Cheri "was placed in an unsafe sleep environment" before she died, but it was unknown if the sleep environment or other external factors caused her death. Cheri had "significant congenital malformation of the brain" and the "postmortem examination and studies do not show significant injuries or other diseases." Cheri's cause and manner of death was "undetermined". The State's exhibit number 3 also included the medical examiner investigator's case report, which contained a summary of the investigator's interviews with both the mother and father on the date Cheri died. According to the summary, at 9:05 p.m., the mother placed Cheri down on an "oversize micro-fiber, sofa chair*** supine on top of a soft neck pillow; alone on sofa chair to sleep." According to the summary, the mother told the interviewer that the father and mother smoked marijuana occasionally and had last smoked about three or four days before the interview.

¶ 43                                    Dr. Glick

¶ 44    After the court admitted the State's exhibits, Dr. Glick, who testified at the temporary custody hearing, testified as follows as an expert in pediatrics and child abuse and neglect. She was a professor of pediatrics and medical director of the Child Advocacy and Protective Service Team at the University of Chicago. Cheri was admitted to Comer in March 2018 with severe malnourishment and "failure to thrive due to environmental factors." It was Glick's opinion that Cheri's initial diagnosis of failure to thrive was based on lack of caloric administration and that she had lost weight and was not eating. From March 2018 to December 2018, Cheri was on Glick's child and protective service team and Dr. Ramaiah, a physician on that team, evaluated Cheri.

¶ 45    Around late April and early May 2019, Glick reviewed Cheri's medical records from both Comer and Loyola because it was brought to Glick's attention that Cheri had lost three pounds since her last visit at Comer on April 24, 2019. Through her review of Cheri's record at Loyola, she also noted that a dietary change had been documented in Cheri's chart. Cheri had been given cow's milk even though she was not to receive cow's milk because she was on a specialized formula as part of her feeding plan. On May 2, 2019, Glick wrote a note in Cheri's electronic medical record that Cheri had lost three pounds over a period of three weeks and that her team had subsequently learned that Cheri had missed a follow-up neurology appointment at Loyola on May 1, 2019. Glick made a report to DCFS for failure to thrive and medical neglect based on the weight loss and lack of follow-up with neurology.

¶ 46    During Glick's testimony, the court asked Glick to leave the room. The court then asked, even if the parents' neglect with respect to Cheri's feeding and sleeping arrangements led to her death, how did that segue "into neglect to the other children?" The court stated that Cheri was a "horribly compromised child" and asked "[h]ow can I segue that into neglect for three healthy kids?" The State told the court that it was not alleging that the parents caused Cheri's death

and stated that it was asking the court to make a finding that G.J., M.K., and N.K. were in a "neglect injurious environment at the very least simply by being cared for by the same caretakers who medically neglected Cheri."

¶ 47       Following the discussion with the parties, Glick resumed her testimony as follows. Asked whether she had an opinion as to whether Cheri was medically neglected up until the date she died, May 9, 2019, Glick testified that it was her opinion that Cheri's failure to follow up with the neurology clinic on May 1, 2019, "was negligent by the parents recognizing the fact that she has a seizure disorder, was medically complex, needs ongoing monitoring and there had been a recent transition back to home within *** a month." On May 2, 2019, Glick's prevailing diagnosis for Cheri was medical neglect and failure to thrive. Her opinion was based in part on the fact that DCFS had been involved in the past due to medical neglect and there had been counseling and a focus on the importance of medical follow-up.

¶ 48       Glick further testified that because she did not know G.J., M.K., or N.K, she could not state what risk existed for them at the time the parents did not bring Cheri to her neurology appointment on May 1, 2019. It was Glick's understanding that these children were "well, healthy" and she did not like to speculate. An emergency room physician evaluated the children in the hospital and found that they were "healthy children being taken care of", they were growing, and they were "developmentally normal." Glick was concerned about the parents' failure to follow up with the neurology appointment because that went to their judgment given Cheri's "medically complex history of seizures."

¶ 49       Glick also testified that she looks at multiple data points regarding the safety and wellness of children, including the parents' compliance with requests that focus on the best interests of the child. A refusal to participate in drug drops is helpful to understand how the parents

are managing their own lives and, therefore, how they will manage to care for a child. She agreed with the court's question that her concern "was not so much the refusal itself to do drug drops but the refusal to go along with what the agency was asking for."

¶ 50    During cross-examination, Glick testified that on March 29, 2019, Cheri weighed about 19 pounds, 10 ounces, and on April 24, 2019, she weighed 16 pounds, 5.6 ounces. The court questioned Glick about why the autopsy report indicated that Cheri weighed 18 pounds, 16 ounces. Glick testified that when Cheri died, she retained water and that her weight at death could not explain her nourishment or whether she had failure to thrive. Glick testified she did not talk to the father about drug issues or drug tests and did not know whether he had been using drugs.

¶ 51    Glick further testified that Cheri was "medically complex" and her neurologist appointment on May 1 was for her diagnosis of Dandy Walker Syndrome, which was congenital malformation of the brain. Asked by the court what Dandy Walker Syndrome was, Glick testified that it meant Cheri's brain was architecturally abnormal because the fourth ventricle did not form correctly and was not developed at birth. Cheri had seizures and "chronic encephalopathy," which were related to the disease. There were "various degrees" of Dandy Walker Syndrome and some children could live into adulthood. If Cheri's seizures were under control and she was nourished, she could have "lasted a very long time." Cheri would have had significant development delays and probably would not have been able to walk, talk, or see. From Glick's review, Cheri could engage with tactile stimulation and was able to smile, giggle, and have good times. She testified that Cheri was a "globally delayed" child and not a "fragile child."

¶ 52                    People's Exhibit Numbers 5 through 12

¶ 53    Following Glick's testimony, the court admitted the State's exhibits numbers 5 through 12. Exhibit number 5 was a certified record from the Chicago Fire Department on May 8, 2019,

which stated, *inter alia*, that upon arrival at the scene, Cheri was "unresponsive, breathless, and pulseless" and according to the mother, the child was last seen when she was put in bed the previous night.

¶ 54    The State's exhibit number 6 were certified records for an Early Intervention service plan for Cheri created by Child and Family Connections. The records contained service notes during Cheri's Early Intervention therapy program, including notes from July 2018 and January 2019. It also contained Early Intervention program discharge report forms prepared by Oak-Leyden Development Services and Early Intervention program six-month review reports prepared by Bee Loved Kids Therapy, Inc. and Oak-Leyden Developmental Services. The discharge report prepared by Oak-Leyden Developmental Services on April 2, 2019, stated that "Cheri began to receive feeding services in February 2019 and is waiting to begin nutrition services" and that her "foster mom has reported some digestive concerns regarding Cheri's formula and diet in general."

¶ 55    The State's exhibit number 7 were certified records from K.A.M. Alliance relating to the mother. The records showed that the mother had missed six of seven drug testing dates between February 2019 to June 2019. Her test on June 6, 2019, was listed as "abnormal" and positive for THC.

¶ 56    The State's exhibit number 8 was a disk containing the complete records for the minors at Hephzibah, including summaries of a DCFS integrated assessment interview for each parent conducted by a licensed social worker and DCFS permanency worker on April 26, 2018, as well as a summary of the interview of Cheri's foster mother conducted on May 3, 2018. In her interview, the mother reported smoking marijuana with the father and that "their use together was five to ten blunts per week." According to the summary, the mother reported, *inter alia*, that she smoked marijuana during her pregnancies to cope with morning sickness, that G.J., MK., N.K., and Cheri

were positive for marijuana at birth, that the amount for each child was low, and that she was able to leave the hospital with the children. At the time of her interview, the mother reported that her last use occurred about one month before the interview. The mother was enrolled in intensive outpatient services and attended services five days per week for three hours a day and was receiving group and individual counseling.

¶ 57       The State's exhibit number 9 were the full and complete medical records for Cheri from St. Bernard Hospital. The State's exhibit number 10 was a copy of a certified statement of conviction for the father in 1997 for murder. The State's exhibit number 11 was a copy of certified statement of conviction for the father in 2012 for a drug related offense. The State's exhibit number 12 was a disk containing the full and complete records for Cheri from Loyola University Medical Center, including her notes from her hospitalization at Loyola on March 26, 2019, through March 27, 2019. The record includes a discharge note for Cheri authored by a physician at Loyola on March 27, 2019, which stated, "Speech has noted that due to the severe neurodevelopmental disorder and history of severe FTT, Cheri likely does not have normal hunger cues and is unable to alert caregivers when she is hungry," and that Cheri "currently drinks pediasure, milk, and formula. Per inpatient Nutrition recommendations (03/2019), she can should [*sic*] transition off of formula and to Cow's milk (whole milk)".

¶ 58                              Anastasia Zacour Testimony

¶ 59       Zacour, the caseworker at Hephzibah Children's Association, testified as follows. When Cheri returned home to her parents on March 25, 2019, her agency had not recommended return home. Her agency believed that there were pending services that the parents needed to complete. As of March 27, 2019, Zacour recommended random urine drops and individual counseling for required reunification services for both the mother and father. With respect to the

counseling services, she testified that since October 2018, she had made referrals for individual therapy for the mother and father with several different agencies. The agencies did not have service providers available in the parents' location so the parents could not do the therapy.

¶ 60    Zacour testified that with respect to the drug drops, the father submitted to a drug drop in March 2018 and testified positive for cocaine. In November 2018, the mother tested positive for marijuana and methamphetamines. The mother had told Zacour that she was going to test positive for marijuana and she denied using methamphetamines. In March 2019, the mother did not complete requested drug drops. The mother completed random urine drops in June, July, and September 2019 and tested positive for marijuana. The mother missed about four or five drops. The father completed one test in June 2019 and tested negative. He missed the other random drop requests. Zacour rated the mother "mostly unsuccessful" and the father as "unsuccessful" with the urine drops. She rated the mother and father as unsuccessful with individual counseling due to the lack of service providers for them, and not due to a lack of completing those services or willingness to engage in them.

¶ 61    On cross-examination, Zacour testified that since August 2018, she had visited the family every week for in-home visits with Cheri. After Cheri returned home in March 2019, she visited the home about three times a month. Based on her experience, the interactions between the children and their parents were appropriate and loving and the parents appropriately provided for the children. The minors were up to date and healthy on their medical needs, they were appropriately fed, their weight was appropriate, and they appeared happy. Zacour never saw any signs of abuse or neglect, and she never had any concerns about their care or safety in the home. She never smelled marijuana or saw any physical signs that led her to believe that the mother had recently been smoking marijuana. The father and mother never appeared to be under the influence

of any substance and she never saw any drug paraphernalia in the home. She did not have any caseworker responsibilities for G.J., M.K., or N.K.

¶ 62   Following Zacour's testimony, the State requested the court consider the records from Hephzibah (exhibit number 8) or "any evidence that either [mother or father] complied with the reasonable requests of Hephzibah whether—to what extent they made progress in reunification efforts and whether or not there was noncompliance for reasons other than a lack of resources." The mother and father objected on the basis that the State only pled in the petitions that the parents had failed to complete drug testing. The court overruled the objections, stating that it was all appropriate with child neglect. The court stated that "no one is alleging that the child died because of anything the parents consciously did." It also stated:

> "[B]ut for the fact I sent the kid home maybe the kid would still be alive so that the fault should be on me, not them, and that they did not adequately feed the kid maybe because of being unsophisticated with respect to medical issues. *** The question is to what degree any of that shows that the other three kids were ever neglected or abused."

The court continued the case until December 6, 2019, and entered and continued the Public Guardian's motion to vacate the order of protection. The court told the father that he wanted him to complete two drug drops before the next court date. The father told the court that he "didn't mess with heroin" or drugs and would "give you two drops after that I'm done."

¶ 63   At the next hearing on December 6, 2019, the State called Zacour to testify. She identified the State's exhibit number 13 as a document from her agency that showed the dates the parents were asked to complete random drug drops. The court admitted the exhibit, which showed drug testing appointment dates for the mother and father between April 24, 2018, and May 3, 2019. The mother completed two tests in April 2018 and two tests in November 2018 and failed to appear

on eight other dates. The father completed two tests in April 2018 and failed to appear on nine other dates. Zacour was concerned that the parents had failed to appear for testing in April 2019 and May 2019. Zacour testified she had asked the father to take a test on November 29, 2019. The father told Zacour that he went later that day, but nobody was there. Zacour asked him to go the next day, but he did not go. The father and the mother had completed a drug test the day before the December 6, 2019, hearing, but the results were pending.

¶ 64                    Testimony from the Father and Mother

¶ 65     The State called the father and mother as adverse witnesses. The father testified as follows. In April 2019, Cheri was with the parents for a few weeks, and the father wanted to make sure he did everything he reasonably could to make sure she was okay. He shared responsibility for feeding Cheri with the mother and they fed her Enfamil at least four times a day. Before they gave her Enfamil, they fed her "something that they said we had to specially get or something to that nature." The amount of Enfamil they gave Cheri depended on how much she would drink out of her bottle. In April 2019, Cheri had regular bowel movements. He was concerned that Cheri could not see and was not functioning how she was supposed to. At one physician's visit, he was told that he could not bring Cheri there unless she had a medical card, which Cheri did not have. He believed Cheri's medical card would come in the mail and he did not go to the Human Service office to follow up.

¶ 66     In April 2019, a therapist for Early Intervention services was in their home for about 20 minutes. The father cooperated with her, listened, did not talk, and did not have aggressive behavior. He testified that the therapist spoke with his wife and did some exercises with Cheri, after which she spoke to them about feeding, sleeping habits, and scheduling. Asked whether the Early Intervention therapist did not come back because of his aggressive behavior, he responded

that "[t]hose were her personal feelings" and that "[a]s far as me having aggressive behavior, no." The father testified that he had heard Zacour testify that he tested positive for cocaine in March 2018 and tested negative in June 2019. He had not taken a drug test since June 2019 because of work. He also testified that in the beginning, he was "more so like being stubborn" and that after he successfully passed a drug class, he was "subjected back to dropping again; but the word was, once you complete this, you would not have to go through that. That's double jeopardy. I'll leave it at that."

¶ 67        On cross-examination, the father testified that since DCFS became involved in the case, there had been a number of professionals who had come into their home to observe his children. After the encounter with the Early Intervention therapist in April 2019, professionals continued to come to their home.

¶ 68        The mother testified as follows. Cheri had a seizure when she first returned home, so she was admitted to Loyola's hospital for two days. Before Cheri was discharged, the mother spoke with the providers at Loyola about Cheri's medications and diet. The mother fed Cheri and gave her medication according to what the doctors told her. She took Cheri to a follow-up pediatrician's appointment at Comer on April 7, 2019, and to another appointment about two weeks later, where they told her that Cheri had lost three pounds. Cheri had another appointment scheduled for May 1, 2019, at Loyola, but she had believed that appointment was on May 2, 2019. When she called to set up special transportation to attend the May 2, 2019, appointment, she found out that she had missed the May 1 appointment. She rescheduled the appointment for May 8, 2019, and set up transportation for that day, which was the same day Cheri died.

¶ 69        The mother further testified that when Cheri was with her, she was concerned about Cheri's weight and wanted to make sure she was feeding Cheri appropriately. She fed Cheri

Enfamil about three or five times a day. She changed her diapers and was concerned about her constipation and breathing. At the end of April, the mother received new feeding instructions for Cheri and was told to start preparing her foods and giving her formula on a different schedule and she adjusted to meet those needs. Zacour came to her house about once each week and observed her feeding Cheri and never told her that she was feeding her inappropriately. The mother was present when the Early Intervention therapist came to their home for about 20 minutes. The therapist showed them exercises for Cheri and they discussed scheduling. The therapist told her she would be back, but the mother did not hear back from her. The mother testified that the next day she heard the therapist was not going to return because the father "was being aggressive when in reality she never said anything for him to be aggressive."

¶ 70                        Testimony from DCFS Investigators

¶ 71        Pamela Gibson, an investigator with DCFS, testified that on May 2, 2019, she received investigatory duties regarding G.J., M.K., N.K., and Cheri. She concluded the investigation at the end of May 2019, and indicated her report for medical neglect of Cheri. With respect to G.J., M.K., and N.K., she indicated her report for substantial risk due to neglect. Her indicated report was based on the fact that there was medical neglect of Cheri and that Cheri died, which caused the other children to be at risk for medical neglect. The young ages of G.J., M.K., and N.K. were also a factor in her decision because the parents were required to make sure that the children went to doctor's appointments and Cheri consistently missed her appointments. Gibson's concern was also based on the parents' general parenting judgment.

¶ 72        Gibson testified that Cheri had Dandy Walker Syndrome and was "medically complex." Dandy Walker Syndrome can cause a child to be intellectually impaired and blind.

Cheri had a "malnutrition situation" and needed a high calorie diet with consistent follow-up. The court engaged in the following colloquy with Gibson:

"Q: So, if she dies, how does that translate to neglect to the two otherwise healthy children? That's what I'm trying to figure out. You can tell me on the one hand let's assume they didn't do everything. They didn't feed the kid right and maybe not enough; but the kid was more horribly, horribly medically complex: blind, deaf could not—never walk— never; very developmentally delayed. The fact that, if we can assume that maybe they didn't do everything they should have with this kid, how does that translate into three relatively healthy kids?

A: Well, because of the age of the children and at this point they were healthy but—

Q: Did you check when they got all their immunizations?

A: I did not call their doctor.

Q: Did you, you didn't check their medical conditions at all?

A: No."

Gibson prepared a Child Endangerment Risk Assessment Protocol (CERAP) for G.J., M.K., N.K., and Cheri as part of her investigation. The State told the court that it was offering the report into evidence as exhibit number 14. The record does not show that the court ever entered the exhibit into evidence, but opposing counsels did not object to the exhibit at trial nor do they dispute the exhibit on appeal. Gibson's CERAP report stated that the mother agreed to a safety plan to place the children with their maternal aunt and that the "safety decision" conclusion was noted as "unsafe." The report stated that the "children are likely to be moderately severely harmed in the immediate future."

¶ 73    On cross-examination, Gibson testified that G.J., M.K., and N.K. were typically developed children and did not have any disabilities. Gibson did not attempt to get medical records for the three children or attempt to contact their doctors. She observed the children two times in the maternal aunt's home and saw no signs of abuse or neglect. They were well cared for, "appeared to be okay," and did not appear to be malnourished. The court asked Gibson "what was the harm that you were concerned about with respect to these three kids based upon the fact that a child who could not walk, think, hear or see died?" Gibson responded: "That was the harm the agency felt could befall upon three healthy kids" and "when one child has an issue, all other children that are in the household are at risk, so we have to make sure that all children are safe until the investigation is through." Gibson told the court that the children looked well-fed.

¶ 74    Owens, another investigator for the DCFS, testified as follows. In May 2019, she concluded an investigation for the case and her report indicated "death by neglect" as to Cheri and "substantial risk/environment injurious" to G.J., M.K., and N.K. Owens identified the CERAP that she prepared and noted that her report concluded that the environment was unsafe for G.J., M.K., and N.K. "due to the death of the sibling, Cheri, and there was unknown cause of death of that child at that time." On May 8, 2019, Gibson instituted a safety plan for G.J., M.K., and N.K. to stay with a relative, and the mother complied with the plan. Owens did not observe any signs of abuse or neglect on G.J., M.K., or N.K.

¶ 75    Owens testified that, on May 8, 2019, the date of Cheri's death, she spoke with M.K., who was four years old. M.K. told her that Cheri had been sleeping next to her on a sofa in the living room and that her parents were sleeping upstairs. M.K. said Cheri's nose was running and that M.K. wiped her nose and opened her eyes. Owens spoke with G.J., who was eight years old, on that same day. G.J. told her in part that Cheri had been sleeping on the sofa in the living room

next to M.K., G.J. and N.K. were sleeping on the sofa next to the wall, and his parents were sleeping upstairs. When G.J. woke up that morning, he checked on Cheri and she was breathing. When he checked on her a second time, she was not breathing. He pushed on Cheri's chest and breathed into her mouth, after which she started breathing. G.J. checked on Cheri a third time and she was not breathing. G.J. did not get his parents because his mother told him not to wake her up when she was sleeping. Owens did not speak with N.K., who was three years old.

¶ 76                                    Dr. Amanda Youmans's Testimony

¶ 77        Dr. Amanda Youmans, a forensic pathologist, testified for the mother as an expert in forensic pathology as follows. She was an independent contractor who performed autopsies and reviewed autopsy reports done by other agencies. She had been practicing as an independent forensic pathologist for eight and one-half years and had performed about 4,000 autopsies. She was hired to provide a consultation regarding Cheri's cause of death and she generated a report. Based on her experience, an infant does not gain weight after death. Rather, after death, a body loses weight because the body loses tissue mass as part of the decomposition process. As part of her review, Youmans did not observe any signs of abuse or neglect on Cheri. She did not see any records that indicated that Cheri was malnourished or dehydrated. She determined that Cheri's cause of death was due to "sudden unexpected epilepsy due to her multiple brain abnormalities" and "sudden unexplained death in epilepsy due to the multiple congenital brain abnormalities."

¶ 78                                       Public Guardian Exhibits

¶ 79        The Public Guardian requested the court admit Minor's Exhibit Number 1 into evidence, which were G.J.'s school records from his elementary school. In the Public Guardian's brief, it states that the exhibit was admitted into evidence. Although the report of proceedings does not show that the court ever stated that the exhibit was admitted into evidence, opposing counsels

did not object to the exhibit at trial nor do they dispute the exhibit on appeal. The record showed, *inter alia,* G.J.'s attendance summary in the 2019-2020 school year, including that he had been tardy twice and absent four times.

¶ 80                                        Closing Argument

¶ 81     The court ordered the parties to provide written closing arguments with their findings of fact and conclusions of law and then continued the case. In the Public Guardian and the State's written closing arguments, they requested the court to make adjudicatory findings of neglect and abuse based on injurious environment and substantial risk of injury. The Public Guardian argued, *inter alia*, that "Cheri's death in the context of the unsafe sleeping environment, missed neurology appointment, missed drug drops, and lack of early intervention services reveals a pattern of poor judgment by the parents," which put G.J., M.K., and N.K. at risk. The Public Guardian asserted that Cheri's non-organic failure to thrive and inadequate feeding throughout her life was isolated only to the time periods when she was in her parents' care and that she thrived when she was in the hospital and foster care.

¶ 82     In the father's closing argument, father's counsel argued that the State failed to prove by a preponderance of the evidence that the minors were neglected or abused. He argued, *inter alia,* that the minors were well cared for, well nourished, current on their medical needs, and never had any signs of abuse or neglect. In the mother's closing argument, mother's counsel argued that the State failed to meet its burden to prove that the minors were abused or neglected. She argued, *inter alia*, that the State failed to present any evidence showing that G.J., M.K., or N.K. were harmed or at risk of being harmed by their parents. She asserted that the DCFS investigators observed the children multiple times and did not observe signs of abuse of neglect and there was no medical evidence that showed that the minors' medical needs were not being met or that the

parents were unwilling to meet their needs. The mother asserted that there was no evidence that showed that the mother or father's failure to comply with the requested drug testing harmed Cheri or the minors.

¶ 83                                    Trial Court's Ruling

¶ 84      On February 21, 2020, the court issued a written ruling, concluding that it could not find anticipatory neglect of the minors by the preponderance of the evidence.

¶ 85      In doing so, the court stated as follows. Cheri was 21 months old and suffered from Dandy Walker Syndrome that, according to Dr. Glick, meant she would always be blind, deaf, bedbound, and suffer from significant developmental delays. Cheri was discharged from Loyola on March 27, 2019, and the medical providers noted that one of the challenges with feeding Cheri was that she had an "inability to give hunger cues and signal when she was hungry or full." At the time of Cheri's discharge, she weighed 19 pounds, 10 ounces, which was about 3 pounds more than what she had weighed when her mother took her in for an appointment on April 24, 2019. Glick stated that Cheri was being given cow's milk when she had been on a special diet and that cow's milk was counterproductive, but it appeared that when Cheri was discharged from Loyola, the mother was told she could start feeding her cow's milk. Cheri's weight at the medical examiner's office was 18 pounds, 6 ounces, which meant she weighed about two pounds more than she did three weeks earlier. Glick stated that when an individual dies she gains weight but Youmans, a forensic pathologist, testified that human bodies do not gain weight after death. Rather, the opposite was true because decompensation begins immediately after death, which causes weight loss. The court found that Youmans testimony, who was an expert in forensic pathology, was more credible than Glick on this issue.

¶ 86    The court further stated that Cheri was born with significant and irreversible disabilities and would never be able to walk, talk, see, or hear, and was developmentally delayed. The court noted that the Public Guardian and the State had argued that Cheri was neglected and that they pointed to her weight loss, missed appointment, unsafe sleeping arrangement, and diet. The court concluded that Cheri's diet and weight loss were at least in part contradicted by other testimony. The court noted that it was not asked to determine that Cheri was neglected and that the parties argued that the three other children were neglected because of the parents' actions as they related to Cheri. The court also stated as follows:

"Because of the facts of this case the court can assume—and does so—that in fact there was medical neglect. This is the beginning, not the end, of the inquiry as to whether the other children were neglected. Anticipatory neglect has a powerful rationale. Courts should not have to wait until a sibling is harmed when the evidence is clear that the neglect of one child could reasonably be inferred by the court to place his or her siblings at risk.

\*\*\*

All witnesses testified that the three children who are the subject of this petition appeared well taken care of. Dr. Glick stated she could not prognosticate any harm to the other three children based on her perception of Cheri's neglect. She stated that they were examined, and they were healthy and active. She could not testify that they were at risk. Each of the other witnesses testified similarly.

This is not a case where an otherwise healthy youngster died because of medical inattention or neglect. In this case a very fragile and compromised human being died—and for purposes of this order the court accepts that there was a medical component in her death.

However, because of her seriously compromised condition there is absolutely no nexus or connection with her siblings. As our Supreme Court noted the mere admissibility of evidence with respect to one child does not constitute conclusive proof of the neglect of another minor. Each case '*must be reviewed according to its own facts*.' (Emphasis in original.) In this case the *prima facie* [*sic*] evidence of neglect is clearly rebutted by the fact that the other children, according to all witnesses, are doing quite well. Any possible nexus also breaks down because of the unique facts surrounding Cheri's life and death.

The State's expert, Dr. Jill Glick, opined that Cheri was neglected but refused [to] prognosticate any possible neglect with respect to the three children who are the subject of this petition. The court has reviewed the record, scrutinized the testimony of the witnesses and studied the law as set by our Supreme Court and cannot find a scintilla of evidence leading him to believe that these children may suffer neglect because of what happened to Cheri. The court simply cannot find any connection between what happened to this terribly compromised child and any possible or probable neglect of the three youngsters named in this proceeding."

This appeal followed.

¶ 87                              II. ANALYSIS

¶ 88        We first address the timeliness of our decision. This case is designated as "accelerated" under Illinois Supreme Court Rule 311(a) (eff. July 1, 2017), which ordinarily requires this court to issue a decision within 150 days after the filing of the notice of appeal, "[e]xcept for good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2017). The Public Guardian filed its notice of appeal on March 23, 2020, and an amended notice of appeal on March 26, 2020. The 150-day period to issue our decision expired in August 2020. However, there was good cause for not meeting that

deadline. The Public Guardian filed three motions for extension of time to file its opening brief, which we granted. The Public Guardian filed its opening brief on September 9, 2020. We granted appellee-father's motion for extension of time to file his response brief to October 30, 2020. We subsequently granted appellee-mother's motion for extension of time to January 15, 2021, to file her brief as well as the Public Guardian's motion for extension of time to file its reply brief to February 11, 2021. On March 8, 2021, we ordered the Public Guardian to file a supplemental record that included the actual disks of the records from Comer, Loyola, and Hephzibah by March 22, 2021, as the exhibits that had been filed at that time only included photographs of the disks. Thus, because this case was not ready for our complete review until March 2021, we find good cause to issue our decision after the 150-day deadline in Rule 311(a)(5). See *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 89    Turning to the arguments raised on appeal, the Public Guardian first contends that the circuit court's dismissal of the petitions for adjudication of wardship of the three minor children was contrary to the manifest weight of the evidence and asserts that there was clear evidence that the environment of the three minors' home was injurious to their welfare. It asserts that the evidence showed direct environmental neglect and anticipatory neglect of the minors. The Public Guardian argues that the minors' home environment was harmful to their welfare because they were living in the home with the parents when Cheri died in May 2019 after she had been returned home to them in March 2019. It asserts that the children were living in the home and witnessed the parents' neglect of Cheri, including that they were not aware of Cheri's health crisis or death until the mother woke up on the morning of May 8 to get G.J. ready for school. The Public Guardian contends that therefore, the children were directly exposed to the parents' neglect of Cheri and they did not overcome the *prima facie* case of neglect of the three children created by

their severe neglect of Cheri. The State did not join the Public Guardian as an appellant, but agrees with the Public Guardian and argues that the court's dismissal of the petitions for adjudication of wardship was contrary to the manifest weight of the evidence.

¶ 90    In response, the father argues that the three minors were not neglected or abused directly or through anticipatory neglect. The father asserts that the State's allegations were based solely on the parents' conduct towards Cheri, who was severely compromised and whose death was not caused by the parents. The father also asserts that there was insufficient evidence that the minors were subjected to any abuse or neglect. We granted the mother's motion for leave to adopt the father's brief and argument.

¶ 91    The Act (705 ILCS 405/1-1 *et seq*. (West 2018)) sets forth a process by which minors may be removed from their parents and made wards of the court. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 70. Under the Act, when a minor is taken into temporary protective custody, the State files a motion that alleges that the minor is abused, neglected, or dependent and that it is in the best interests of the minor and the public that the minor be adjudged a ward of the court. 705 ILCS 405/2-13(3) (West 2018). "After a temporary custody hearing, an adjudicatory hearing is held to determine whether a preponderance of evidence demonstrates that the minor is abused, neglected, or dependent." *Zariyah A.*, 2017 IL App (1st) 170971, ¶ 71 (citing 705 ILCS 405/1-3(1), 2-21(1) (West 2016)).

¶ 92    At the adjudicatory hearing, the trial court only considers the question of whether the minor is abused, neglected, or dependent. *In re J.S.*, 2020 IL App (1st) 191119, ¶ 69. "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman,* 134 Ill. App. 3d 393, 396-97 (1985)). The standard civil rules of evidence apply at the

adjudicatory hearing. 705 ILCS 405/2-18(1) (West 2016). If the trial court determines that a minor has been abused, neglected, or dependent at the adjudication hearing, then the trial court proceeds to a dispositional hearing. *In re J.S.*, 2020 IL App (1st) 191119, ¶ 69.

¶ 93 Here, the Public Guardian challenges the juvenile court's finding following the adjudication hearing in which it dismissed the petitions for adjudication of wardship that alleged that the minors were neglected based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused based on a substantial risk of physical injury to the minors by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function (705 ILCS 405/2-3(2)(ii) (West 2018)). The court also concluded that it could not find anticipatory neglect of G.J., M.K., or N.K. by a preponderance of the evidence. The Public Guardian and the State argue that the evidence showed direct neglect and anticipatory neglect.

¶ 94 "A 'neglected minor' includes any minor under 18 years of age whose environment is injurious to his or her welfare." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 24. "Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006). "An injurious environment is an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children." *Zion M.*, 2015 IL App (1st) 151119, ¶ 24. The focus is whether the minor is neglected, not whether the parent is neglectful. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 40. An abused minor includes any minor whose parent creates a substantial risk of injury to the minor by other than accidental means, which would be likely to cause death, disfigurement, impairment

of physical or emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2018).

¶ 95        With respect to anticipatory neglect, under this theory the State "seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Arthur H.*, 212 Ill. at 468 . This theory flows from the "injurious environment" concept described above. *Id.* at 468. The theory of anticipatory neglect "recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children." *Zion M.*, 2015 IL App (1st) 151119, ¶ 30.

¶ 96        There "is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household." *Id*. However, "the neglect of one minor is admissible as evidence of the neglect of another minor under a respondent's care." *Id.* (citing 705 ILCS 405/2-18(3) (West 2012)). Further, "mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor." *Arthur H.*, 212 Ill. 2d at 468. Rather, "even where *prima facie* evidence of abuse or neglect is presented, it creates only a rebuttable presumption that may be overcome by the introduction of other evidence." *In Interest of K.G.*, 288 Ill. App. 3d 728, 736 (1997)). "Neglect of a sibling 'becomes incredibly less important than what is occurring with, and to, the specific minor in question.' " *In re Z.L.*, 2020 IL App (1st) 200151, ¶ 27 (quoting *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35)). "To determine whether a finding of anticipatory neglect is appropriate, the trial court should consider the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling." *In re J.P.*, 331 Ill. App. 3d 220, 235 (2002)

¶ 97    Cases involving allegations of abuse and neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Arthur H.*, 212 Ill. 2d at 463. Further, the definition of "neglect" "is not one of 'fixed and measured meaning' and takes its content from the specific circumstances of each case." *In re Christina M.*, 333 Ill. App. 3d 1030, 1034 (2002) (quoting *In re J.M.*, 245 Ill. App. 3d 909 (1993)). "This analytical principle underscores the " 'fact-driven nature of neglect and injurious environment rulings.' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)).

¶ 98    It is the State's burden to prove the allegations by the preponderance of the evidence, which means that the State must prove that the allegations of neglect or abuse are more probably true than not. *Zion M.*, 2015 IL App (1st) 151119, ¶ 23. On review, we will not reverse a trial court's findings unless they are against the manifest weight of the evidence. *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. A finding is considered to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* Under this standard, we must give deference to the trial court's factual findings, as the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence. *In re Davion R.*, 2019 IL App (1st) 170426, ¶ 78. We must not substitute our judgment for that of the trial court regarding the credibility of the witnesses, the weight to be given the evidence, or the inferences to be drawn. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 38. Further, the trial court has broad discretion in determining whether there is abuse and neglect and there is a strong and compelling presumption in favor of the result reached by the trial court. *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29.

¶ 99    Applying these standards here and under the unique facts and circumstances of this case, the trial court's order that dismissed the petitions for adjudication of wardship for G.J., M.K.,

and N.K. and found that the State did not prove anticipatory neglect by the preponderance of the evidence was not against the manifest weight of the evidence. From our review of the unique circumstances presented in this case, an opposite conclusion is not clearly evident.

¶ 100    The caseworker who worked with the family and the investigators who investigated the parents' home after Cheri died all testified that they did not see any signs of abuse or neglect on G.J., M.K., or N.K. Specifically, Zacour, the caseworker who had visited the family every week between August 2018 to March 2019 and three times a month thereafter, testified that she never saw any signs of abuse or neglect on G.J., M.K., or N.K. and she never had any concerns for their care or safety in the home. She testified that the parents' interactions with their children were appropriate and loving, the parents appropriately provided for them, the minors' weights were appropriate, and they were up to date on their medical needs. Likewise, Gibson, who investigated the home after Cheri died, testified that she saw no signs of abuse on G.J., M.K., or N.K., and that they were typically developed children. According to Gibson, the minors were well cared for and looked well fed. Similarly, Owens, who investigated the home after Cheri died, testified that she did not observe any signs of abuse or neglect on the G.J., M.K., or N.K. In addition, Dr. Glick testified that based on her review of Cheri's medical records, the minors were healthy, and an emergency room physician evaluated them in the hospital and found that they were "healthy children being taken care of" and "developmentally normal."

¶ 101    The State's petitions for adjudication of wardship for G.J., M.K., and N.K. focused on the facts surrounding Cheri's medical care and her death and the trial court's order assumed that there was medical neglect of Cheri. Further, Gibson and Owens testified that their CERAP reports for G.J., M.K., and N.K. were indicated for, respectively, substantial risk due to neglect based on the medical neglect of Cheri and substantial risk/environment injurious due to Cheri's death and

her unknown cause of death. However, evidence of Cheri's medical neglect under the parents' care does not constitute conclusive proof of the neglect of the other minors. Rather, under the theory of anticipatory neglect, the trial court should consider "the current care and condition of the child in question and not merely the circumstances that existed at the time of the incident involving the child's sibling." *J.P.*, 331 Ill. App. 3d at 235. As previously discussed, the evidence concerning the care and condition of the minors showed that they were not abused or neglected and that they were well cared for. Further, the State did not introduce any testimony to show that G.J., M.K., or N.K. lacked medical care, were in bad health, or had missed doctor's appointments or immunizations. See *Arthur H.*, 212 Ill. 2d at 476 (concluding that on the "specific record," the trial court's finding that the minor was neglected was against the manifest weight of the evidence, noting that the State did not introduce any testimony that the minor was in ill health, had missed his immunizations, had developmental delays, or had not been taken to a doctor"). On this particular record, there was no evidence that G.J., M.K., or N.K. were not receiving proper medical care, and the evidence concerning the circumstances surrounding Cheri's medical neglect was outweighed by the evidence demonstrating that G.J., M.K., and N.K. were not abused or neglected.

¶ 102     Moreover, as previously discussed, in cases involving abuse and neglect, we must decide the case on the basis of its unique circumstances which included Cheri's complicated medical situation. The trial court found that "because of [Cheri's] seriously compromised condition there is absolutely no nexus or connection with her siblings" and that any "possible nexus also breaks down because of the unique facts surrounding Cheri's life and death." We cannot find that these findings are against the manifest weight of the evidence. Dr. Glick testified that Cheri was "medically complex" and had Dandy Walker Syndrome, which was a congenital malformation of the brain, and that she had seizures and "chronic encephalopathy" related to the

disease. In addition, Dr. Youmans, an expert in forensic pathology and whom the trial court found credible, did not observe any signs of abuse or neglect on Cheri and did not see any records that indicated that Cheri was malnourished. Dr. Youmans had performed about 4,000 autopsies and had been an independent forensic pathologist for over eight years. Dr. Youmans testified that Cheri's cause of death was due to "sudden unexpected epilepsy due to her multiple brain abnormalities." Gibson also testified that Cheri was "medically complex" and needed a high calorie diet with consistent follow-up. In addition, the medical examiner's report stated that Cheri had "significant congenital malformation of the brain." Given the unique circumstances regarding Cheri's complicated medical situation and considering that the trial court was required to examine the current care and condition of G.J., M.K., and N.K, and not merely the circumstances that existed with Cheri, we cannot find that the trial court's finding that the State failed to prove anticipatory neglect of the minor children was against the manifest weight of the evidence.

¶ 103    The Public Guardian asserts that a major environmental factor supporting the conclusion that the minors' home was injurious to their welfare was the parents' use of drugs and their refusal to provide urine samples for testing. We recognize that Zacour testified that the father tested positive for cocaine in March 2018 and that the mother tested positive for marijuana and methamphetamines in November 2018. We also recognize that the mother tested positive for marijuana in June, July, and September 2019 and that the parents missed appointments for random drug tests. However, there was other evidence that the children were not neglected. As previously discussed, Zacour, who had visited the home every week between August 2018 to March 2019 and then three times a month thereafter, testified that she never had any concerns for the minors' safety or care in the home. Further, Zacour testified that she never smelled marijuana or saw any physical signs that led her to believe that the mother had recently been smoking marijuana. She testified

that the father and mother never appeared to be under the influence of any substance and she never saw any drug paraphernalia in the home. Considering all of the evidence, the court's finding that the children were not neglected was not against the manifest weight of the evidence.

¶ 104     In addition, we cannot find that evidence relating to the parents' missed drug tests alone shows that the minors were abused or neglected. See *In re A.J.*, 296 Ill. App. 3d 903, 916 (1998) ("The State does not, and cannot, argue that merely undergoing drug testing necessarily makes one a better parent. The statute imposes no such requirement."). Considering all of the evidence, the evidence relating to the missed drug tests did not sufficiently show, without more, that the parents were endangering the minors' welfare or that they had a drug problem that was preventing them from caring for the minors. In fact, Dr. Glick testified that she agreed with the court that her concern with the parents' missed drug tests "was not so much the refusal itself to do drug drops but the refusal to go along with what the agency was asking for." Accordingly, we are unpersuaded by the Public Guardian and the State's argument that the evidence relating to the parents' drug use and missed drug tests shows neglect or anticipatory neglect or that the environment was injurious to the minors' welfare.

¶ 105     The Public Guardian also claims that a harmful circumstance in the home was that the parents had not completed individual therapy, which was recommended by Hephzibah. We disagree. The evidence shows that the parents could not participate in therapy due to the lack of service providers in their area, not that they simply failed to comply. Zacour testified that since October 2018, she had made referrals for individual therapy for the mother and father with several different agencies, but the parents could not complete the therapy because the agencies did not have service providers available near where the parents lived. Further, Zacour testified that she rated the parents unsuccessful on therapy "due to lack of service providers for them, not lack of

willingness to engage." The Public Guardian even acknowledges that there were no therapists available for the parents, asserting: "Although the testimony was that the agency made several referrals and therapists were not available, so that the failure to even engage in therapy by May 2019 was not the parents' fault, that contributed to the injurious environment in the home." Accordingly, we are unpersuaded by the argument that a finding of environmental neglect is supported by the fact that the parents did not complete required individual therapy.

¶ 106    The Public Guardian also asserts that "even though the children appeared healthy, [M.K.] had an elevated lead level." To support this argument, the Public Guardian cites summaries of the integrated assessment interviews prepared by DCFS following an interview with a licensed social worker and a DCFS investigator with the mother on April 26, 2018, and with the foster mother on May 3, 2018, which are included in the Hephzibah records. The summary of the interview with the mother states that "[a] collateral report noted [M.K.] and Cheri had high lead levels" and the summary of the interview with the foster mother states that "[t]he foster mother noted Cheri and her sister [M.K.], who had previously placed in her home, had high lead levels." Although the court admitted the Hephzibah's records into evidence, there was no testimony or any other evidence about M.K.'s elevated lead level. There was no evidence to explain M.K.'s elevated lead level and how an elevated lead level related to the parents' neglect or anticipatory neglect of the minors. In addition, we note that neither the Public Guardian's nor the State's findings of fact included any argument based on M.K.'s elevated lead level. Given the lack of evidence about M.K.'s elevated lead level and how that related to the parents' failure or inability to care for the minors, we cannot conclude that the court's finding was against the manifest weight of the evidence based on M.K.'s elevated lead level.

¶ 107    The Public Guardian further claims that the environment was harmful to the minors because there was evidence of the "father's aggressive or intimidating behavior that affected the willingness of a service provider to come to the home" and that "the physical therapist who came to the home for Cheri did not want to return because of the father's aggressive behavior." To support the Public Guardian's argument, it cites to a note authored by Dr. Glick in Cheri's medical records from Comer that states that "[t]he therapist from Early Intervention does not want to return to the home due to Cheri's dad's aggressive behaviors." However, the mother and father were the only witnesses who testified at the adjudication hearing about the father's interaction with the therapist. The father testified that he listened to the therapist and did not have aggressive behavior. The mother testified that the day after the therapist came to the home, she heard she was not going to return because the father "was being aggressive when in reality she never said anything for him to be aggressive." To support its argument, the Public Guardian also references the summary of DCFS's integrated assessment interview conducted with the father on April 26, 2018. According to the summary of the interview, the father "presented as highly animated at times during his IA interview, specifically when discussing the current DCFS involvement" and "[h]e was observed walking around portion of his living room and the dining room area of his home while speaking rapidly." The summary further stated that the father "often spoke tangentially when discussing the Department involvement; however, was able to be redirected by the Clinical Screener at times" and that he "became emotional when discussing Cheri's future developmental and overall needs." The Public Guardian also cites the medical examiner's report, which stated: "Per [the mother], [the father] became angry and ripped the kitchen cabinet doors off the hinges after learning of [Cheri's] death."

¶ 108    From our review, we cannot find that this evidence relating to the father's behavior with the therapist, following Cheri's death, and during the integrated assessment interview shows that his behavior was harmful or injurious to G.J., M.K., or N.K.'s environment. See *In re N.B.*, 191 Ill. 2d 338, 351 (2000) (the court reversed the finding that the children were neglected, noting that "the evidence adduced at the adjudicatory hearing did not support the inferential leap that when respondent lost her temper, she became blinded to the well-being of her children."). We are therefore unpersuaded by the Public Guardian's argument that the evidence relating to the father's behavior showed that his aggressive behavior was harmful to the children's environment.

¶ 109    Accordingly, under the unique facts and circumstances in this case and considering that we must defer to the trial court's factual findings, as it was in the best position to observe the witnesses and weigh the evidence, we conclude that the trial court's conclusion that dismissed the petitions and found that the State did not prove anticipatory neglect by the preponderance of the evidence was not against the manifest weight of the evidence. The evidence does not show that an opposite conclusion is clearly evident.

¶ 110    The Public Guardian next contends that the court misheard or misremembered the evidence when the court speculated about the reason for the Early Intervention therapist's reaction to the father. Specifically, the Public Guardian asserts that the court interrupted the father's testimony about Cheri's Early Intervention therapist to ask about her race and that "[u]pon hearing that she was white, the court speculated that she might have been concerned by a certain way that African-Americans in marginalized neighborhoods talk. But the father had just testified that he didn't say a word to the therapist." The Public Guardian asserts that "the court was speculating about the reason for the therapist's reaction, in a way that was not even consistent with the evidence."

¶ 111    In a bench trial, as here, we presume that the trial court only relied on competent evidence to reach its decision. *In re Charles W.,* 2014 IL App (1st) 131281, ¶ 37. That presumption "can be overcome when there is an affirmative showing in the record to the contrary." *City of Chicago v. Garrett*, 136 Ill. App. 3d 529, 533 (1985). Neither the Public Guardian nor the State point to anything in the court's written order that showed that the court relied on improper evidence when it reached its decision. We therefore must presume that the court only relied on competent evidence.

¶ 112    The Public Guardian also contends that the court misinterpreted the evidence with respect to Cheri's condition. It asserts that the court repeated that Cheri was "horribly compromised," that it stated in its written order that she was "very fragile and compromised," and that it expressed at the first temporary custody hearing in 2019 that her death was not unexpected. The Public Guardian argues that the medical evidence presented by the State showed that Cheri was "significantly delayed but was *not* fragile." (Emphasis in original.) It asserts that the court's view that Cheri was a fragile child whose death was not unexpected was not supported by the evidence and that its misinterpretation of this evidence allowed it to downplay the significance of its finding of medical neglect of Cheri in 2018.

¶ 113    The court properly considered the medical evidence of Cheri's condition. The court's statements regarding Cheri's condition are supported by the evidence. At the adjudication hearing, Glick testified that Cheri had Dandy Walker Syndrome, which was congenital malformation of the brain, meaning that it was architecturally abnormal because the fourth ventricle did not form correctly. She testified that Cheri had seizures and "chronic encephalopathy," which were related to the disease, and that she needed ongoing monitoring. Glick also testified that Cheri would have significant development delays, was a "globally delayed" child, and probably would not be able

to walk, talk, or see. Gibson testified that Cheri was "medically complex" and that she needed a high calorie diet with consistent follow-up. Dr. Youmans testified that Cheri's cause of death was due to "sudden unexpected epilepsy due to her multiple brain abnormalities." Further, the medical examiner's report stated that Cheri had "significant congenital malformation of the brain." Accordingly, we find that the court's statements regarding Cheri's condition was supported by the evidence.

¶ 114    The Public Guardian takes issue with the court's reference to Cheri as "fragile" and argues that it was not supported by the evidence. We recognize that at the adjudication hearing, Glick testified that Cheri was a "globally delayed" child and not a "fragile" child. However, at the temporary custody hearing, Glick referred to Cheri as a fragile child, stating, "You know, you have a fragile child and three children, there's a lot of work, you have to be on your game always. And so I would hope that parents would, if requested by the Court to take these tests, they would both take it and pass it." Moreover, at the adjudication hearing, the Public Guardian stated that Cheri's condition was fragile stating, "But we can't conceive that that act, the unsafe sleeping played no role in Cheri's death and we are dealing *** with a fragile child." Given the foregoing and that the evidence at the adjudication hearing showed that Cheri had multiple complexities, the court's statement that Cheri was "fragile" does not indicate that it misinterpreted the evidence regarding Cheri's medical condition or that it misinterpreted the evidence relating to the care and condition of G.J., M.K., and N.K.

¶ 115    Lastly, the Public Guardian asserts that the court did not ask or request the State to ask the question under the Indian Child Welfare Act, which states:

"State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the

child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record." 25 C.F.R. § 23.107 (West 2018).

The Public Guardian asserts that at the first temporary custody hearing in May 2019, the court agreed with the State that because it had the case before in 2018, it did not need to ask any questions under this Act. The Public Guardian did not object to the court's failure to ask the required questions and it asserts that the failure to ask the questions is not at issue. Rather, the Public Guardian asserts that the failure to ask the questions is an example of one of the ways in which the court ignored the manifest weight of the evidence and preferred to view the 2019 cases as a continuation of the 2018 cases without taking into account the evidence of circumstances that changed in the minors' home environment, including Cheri's death and the court's assumption that Cheri was medically neglected before she died.

¶ 116    As previously discussed, in a bench trial we presume that the trial court only relied on competent evidence to reach its decision (*Charles W.,* 2014 IL App (1st) 131281, ¶ 37), which "can be overcome when there is an affirmative showing in the record to the contrary" (*Garrett*, 136 Ill. App. 3d at 533). From our review of the record, the court's failure to ask the question under the Indian Child Welfare Act does not affirmatively show that it misinterpreted the evidence it heard at the adjudication hearing on the instant petitions or that it did not rely on competent evidence to reach its decision. Again, neither the Public Guardian nor the State point to anything in the court's written order showing that it did not rely on competent evidence. Thus, we are unpersuaded by the Public Guardian's argument.

¶ 117                    III. CONCLUSION

¶ 118    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 119    Affirmed.